In re Appropriation for Highway Purposes: Masheter, Dir. of Highways, Appellant, *v.* C. H. Hooker Trucking Co. et al., Appellees.

(No. 1005—Decided August 18, 1969.)

*Mr. Paul W. Brown,* attorney general, and *Mr. Thomas H. Hisrich,* for appellant.
*Mr. Joseph M. Streb,* for appellees.

Putman, J. This appeal on questions of law from a six thousand dollar ($6,000) judgment of the Common Pleas Court of Tuscarawas County entered upon a jury verdict in a highway appropriation case came on for hearing upon the original papers, briefs of the parties and bill of exceptions, oral argument having been waived.

The state of Ohio contends that the market value opinion of the appraiser called by the property owners should have been stricken from the record because it was based in part on hearsay.

The appraiser testified on cross-examination that after having determined for himself the tonnage of coal and clay on the subject property by personal observation and reference to a recognized book on geology, he then sought and relied upon the opinion of mine operators on the issue of whether such coal and clay were profitably mineable. The mine operators did not testify.

It is urged by the state of Ohio that it is denied its right to cross-examine the mine operators unless the rule be that the property owner must bear the expense of calling

the coal mine and clay mine operators separately as his witnesses to offer their opinions and then include such testimony in a hypothetical question put to his appraiser.

Such a rule is contrary to both reason and authority.

## I.

Gains in the fair market value resulting from "hearsay" (or otherwise) are property. They belong to the owner.

They are not to be taken by the government without just compensation.

What the sovereign cannot do directly by journal entry of its Highway Director, it cannot accomplish indirectly through its rules of evidence.

The rule is well established that:

"An expert may testify as to value, even though his conclusions are based in part, or even entirely, upon hearsay evidence." *H & H Supply Co.* v. *United States* (1952), 194 F. 2d 553, paragraph 4 of the headnotes.

See, also, the mass of authority in West's Digest, Evidence, key 555; 5 Nichols on Eminent Domain, Section 18.42, Basis of opinion, pages 253-256; Wigmore on Evidence 2d Ed., Section 562; 2 Lewis Eminent Domain 3rd Ed., Section 654.

Rules of evidence respecting the opinions on "market value" of skilled real estate appraisers are rooted in reason inseparable from the nature of the market place itself. Land does not sell in the law library, it sells in the market place. By definition, market means a buyer and a seller.

All factors which would be considered by willing, able, fully informed buyers and sellers in fixing the value should be considered by the witness in reaching his opinion. *Anglo California Natl. Bank* v. *Lazard*, 106 F. 2d 693, certiorari denied, 308 U. S. 624, 84 L. Ed. 521, 60 S. Ct. 379; *United States* v. *Delano Park Homes, Inc.*, 146 F. 2d 473; *United States* v. *25.406 Acres of Land*, 172 F. 2d 990, certiorari denied, 337 U. S. 931, 93 L. Ed. 1738, 69 S. Ct. 1496.

If the item of information is such that it would have an effect upon the price a willing, able, fully informed

buyer or seller would pay or receive, then the appraiser not only "may" take it into consideration in forming his judgment about the "market price" but courts recognize that to be worth his salt, the appraiser is *compelled to* consider it.

To adopt a rule of law which closes the courtroom door to the appraiser with a keen ear for the things which move markets up and down would make as much sense as to close the courtroom to doctors who cannot resurrect Louis Pasteur to first testify as to his original experiments.

The law allows opinions to be received upon the question of market price or "value," and "hearsay" moves the market. An appraiser collects, distills and summarizes "hearsay." "Hearsay" is the stuff of the market place.

The existence of hearsay in the community is a fact of the market place which the expert puts into evidence by his statement that he found it. In the legal sense this is not a hearsay use of the statement at all because it is received not as proof of the truth of the matters contained therein but rather to show the fact of its circulation.

The very fact that coal and clay mine operators are expressing an opinion in the community that coal and clay are profitably mineable on subject land is a fact which apart from its truth may have an actual influence upon the price able and willing buyers and sellers are willing to pay and receive. Whether it does is for the jury. Moreover, can a buyer or seller be said to be "fully informed" who is ignorant of the fact that such coal and clay operators are willing to express such an opinion to prospective buyers and sellers?

We note with care that the presence of and quantity of the minerals were observed by the appraiser and testified to in his direct testimony. No claim of hearsay or "not proven" is made as to this. The fact that the appraiser talked with others who knew the economics of the mining business was a sound and common appraisal practice.

Similarly, it is customary in these cases for apprais-

ers to use recent sales of comparable properties as an approach to estimating market value. They proudly declare they have "verified" these "sale prices." How have they verifed them? They take the word of one or both parties to the transaction. Certainly this is "hearsay" in the sense that the word means simply what some one else told them.

Even if untrue, the fact that these parties declare it to be the price to the community may influence the subjectives prices of willing buyers "fully informed."

## II.

We turn now to the separate issue of the importance of who decides.

It is well for us to remember first what we are involved with so that we do not permit legal language to defeat the very purposes for which we exist as courts.

A private citizen has suffered the confiscation of his land by his government. Both state and federal Constitutions say his compensation shall be just and that this compensation is the fair market value. *United States* v. *Miller*, 317 U. S. 369, 374; 87 L. Ed. 336; 63 S. Ct. 276.

More important than the right to compensation is the right to have a jury say what it shall be.

Not only is it not the Ohio state law that opinions of witnesses as to market value may not be based on hearsay but such a law would violate the Ohio constitutional right to have a jury decide state of the market. Section 19, Article I, Constitution. Under our system of ordered liberty under law, judges are denied the governmental competence to judge the fair market value of land in these cases absent consent of the property owner.

If it is the opinion of the value witness that certain "hearsay" affects the fair market value, then the right to place it before a jury springs directly from the Constitution of the sovereign who has taken the land. If a judge were to take the entire opinion from the jury's consideration, it would be a denial of this citizen's right to have a jury composed of his fellow citizens decide the market, and hence his compensation.

Private ownership of property and free markets are essential to liberty.

If the government is permitted to force the citizen to trade his land for paper money, the decision making power as to the ratio of exchange must be kept in the hands of the people acting through juries, and the decision making procedure must not be so complex or expensive as to discourage the citizen from using it.

Free men have devised these rules as a shield against the arbitrary exercise of government power. We do it this way to stay free.

No error was assigned respecting the court's charge.

Upon careful consideration, we find no error apparent upon the face of the record prejudicial to the substantial rights of the state of Ohio.

All five assignments of error were carefully considered and are overruled.

*Judgment affirmed.*

Van Nostran, J., concurs.

Rutherford, J. dissenting. I do not disagree with the conclusions stated in the majority opinion or even the syllabus as general statements of law which might be applicable under some factual situations, but dissent as to their applicability to particular facts of this case; therefore feel it necessary to set forth the testimony which the majority opinion appears to hold admissible in evidence in an appropriation case.

The appropriation in this case was of .845 acre from a tract of 5.82 acres of unimproved land. The jury returned a verdict fixing compensation of $5,000 for land taken and $1,000 for damages to residue; upon which verdict judgment was rendered in the total sum of $6,000.

The court instructed the jury that it could consider coal and clay in place as part of land taken and also in considering the value of the residue before and after the appropriation.

The only witness to testify as to the coal and clay and its value was Mr. McMillan, a witness for the property owner, who testified as to the value of the property taken, as follows:

"Q. Mr. McMillan did you form an opinion of the real estate taken? A. Yes.

"Q. What is your opinion? A. The value of the total take $10,398.00.

"Q. In determining that can you give us the factors you considered? A. Yes.

"Q. Do that. A. 530 feet of frontage on Township Road 287—$5300.00, 60 feet of front on the north side of Township Road 287—$312.00, approximately 300 feet of 4" pipe line, high pressure gas line at $720.00, coal— $14,000.00 and clay $2666.00.

"Q. What was the total value of the property taken? A. $10,398.00.

"Q. Do you have an opinion as to the value of the remainder of the property before the taking and severance? A. $1633.00.

"Q. Do you have an opinion as to the fair market value of the residue after the taking? A. Yes.

"Q. What is that? A. $484.00."

Upon cross-examination, Mr. McMillan testified:

"Q. Did you in determining your value as far as damages, place a value on that coal and clay? A. In my appraisal?

"Q. Yes. A. Yes, I placed value on it.

"Q. Did you place a per ton value on it? A. Yes, sir.

"Q. And you valued it separately? A. That is right.

"Q. And these values were included in your appraisal of value which you testified here to be the fair market value of the property? A. Yes, sir.

"Q. These values were separate from the land? A. Yes."

And further:

"Q. Mr. McMillan, this presence of coal and clay you noted on the property, I assume you made a determination that this was profitably mineable? A. Mr. Hisrich, I am not a coal and clay operator. Therefore, I do not profess to be and when I have a proposition of this kind I go to a coal or clay operator or someone who is qualified to give me an idea of what it is and that is what I did.

"Q. In other words you are basing your opinion on someone else? A. Mr. Lee's for coal and Mr. Henry for clay. They are both old time operators in that field.

"Q. But you yourself would not know if it was profitable to mine them? A. No, I am not a coal or clay man and I couldn't say.

"Q. But you did give a value to the coal and clay separate from the land? A. I did.

"The Court: What do you mean? There is no evidence he gave it separate from the land, isn't that correct. It was all ruled out. If he did the court will rule it out.

"Mr. Streb: He should confine the valuation to the total, just considering the factors.

"The Court: My recollection is he started to say how many tons of coal was under the land and how many tons of clay and when he approached that part of it where he probably intended to give the price, the court stopped it. That is the court's recollection, and there is nothing in there where he said how much separately it is worth.

"Mr. Streb: If he did, we would ask it be withdrawn from the consideration of the jury.

"The Court: It will be so ordered. Ladies and gentlemen when you start to consider the case, when you retire to the jury room you may consider the value of the land as a whole, taking into consideration that it may be underlaid with coal and clay, but you are not to consider the value of the coal and clay separate from the land. . . . .

"Mr. Hisrich. At this time I would like to move to strike the testimony of Mr. McMillan on the basis it is in part based on hearsay with regard to coal and clay testimony and move to strike his testimony on the basis of the case of Stover Leslie Flying Service, Inc., 174 O. S. 441.

"The Court: The motion will be overruled."

Upon redirect examination, Mr. McMillan further testified:

"Q. In determining your (sic) before the take value you considered the existence of coal and clay? A. Yes.

"Q. But you did not place a specific value on the coal and clay? A. No, part of the real estate.

"*  *  *.

"Q. Your mention of coal and clay, how did you determine the existence of coal? A. I determined the tonnage.

"Q. How did you determine it was there in the first place? A. It was visible on the bank, you could see outcroppings of it. In the only book on geology of the state of Ohio written by Ramond Lamborn it states there is in Union Township a field of Cataning over a wide area and not being a clay operator or coal operator *I did not feel qualified to estimate it so I sought the advice of someone qualified,* as stated before." (Emphasis added.)

And further on recross-examination:

"Q. Mr. McMillan, going one step further, assuming that you have a piece of property fronting on a township road and assuming there would be coal in that particular piece of property, there are many things that enter into whether the coal on that particular piece of property can be mined other than the fact of its mere presence there, is that not correct? A. Correct.

"*  *  *.

"Q. And I believe you testified you did not yourself have particular knowledge about coal but relied on others, is that correct? A. That is right."

Clearly, Mr. McMillan was not qualified to testify as an expert on either coal or clay and by his own admission his testimony relative to coal and clay upon which he was permitted to fix a value of coal at $1,400 and a value of clay at $2,600 was based solely upon hearsay. I cannot concur in an opinion which holds this hearsay evidence to be admissible under the guise of expert testimony, and I would find such error to be prejudicial since it cannot be said that the jury might not have returned a diffierent verdict but for the admission of such incompetent testimony. Whether or not the jury in determining compensation for land taken included $1,400 for coal and $2,600 for clay I cannot determine, but the value of $5,000 fixed for .845 of an acre of unimproved land indicates that they may have.

If the court did not consider the testimony of Mr. McMillan relative to coal and clay to have been admitted,

there should have been no instruction in the court's general charge to the jury relative thereto, since there was no other testimony on the subject. If the testimony was admissible as held by the majority opinion of this court, then the instruction was proper and not subject to objection.

I would overrule the assignment of error in No. 3. I would further find the admission of exhibit C showing lands owned by the plaintiff other than those from which the appropriation was made to be error, but standing alone, I would not find such to be prejudicial.

If there was prejudicial error in the admission of evidence, it is not necessary to rule upon assignment of error No. 5.

For the reasons stated herein, I would reverse the judgment and remand this cause for a new trial and further proceedings according to law. It is important that the property owner receive just compensation but equally important to the public who makes payment that the jury's determination be made upon admissible evidence.